# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3085 | **DATE** | 5/21/2003 |
| **CASE TITLE** | SEC vs. Collins | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth on the attached Memorandum Opinion and Order, the Court orders Jerome Coppage to pay a first tier civil penalty in the amount of $40,000.00 and orders Bill Wilson to pay a first tier civil penalty in the amount of $46,000. Separate judgment is entered as to each defendant. The SEC's request for relief is otherwise denied.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | MAY 27 2003 | |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING | date mailed notice | |
| OR6 | courtroom deputy's initials | 03 MAY 27 AM 9:25 Date/time received in central Clerk's Office U.S. DISTRICT COURT | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | Case No. 01 C 3085 |
| RICHARD J. COLLINS, d/b/a Capital Investment Concepts, Ltd., Cutting Edge Marketing, Light of the World, and Midwest Financial Funds; BILL WILSON; JEROME COPPAGE; THE GATEWAY ASSOCIATION; and THE GATEWAY ASSOCIATION (ILLINOIS), | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| DAVID MORGENSTERN; WILLIAM J. WINDSOR; LINDA A. FEHL; MALCOLM SILVERMAN; JANET COLLINS; and CHRISTINE TODD, | ) ) ) ) ) | DOCKETED MAY 2 7 2003 |
| Relief Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

According to the complaint filed by the Securities and Exchange Commission, the defendants in this securities fraud case participated, to one degree or another, in a fictitious "prime bank" investment program known as "The Gateway Association Inc." Gateway's investment program promised huge profits to lure more than 400 investors in, ultimately bilking them out of more than ten million dollars. Along with the scheme's mastermind, Richard J. Collins, the Association and other Association-related entities, the SEC named as defendants

Jerome Coppage and Bill Wilson. According to the SEC, Coppage, an insurance agent, was "a partner in Gateway [who] signed investment agreements on behalf of Gateway" and was "a signatory on numerous bank accounts that held investor funds"; "[h]e attended investor meetings with other Gateway promoters, making numerous material misrepresentations and omitting to state material facts to investors in Gateway." Complaint, ¶12; Brief in Support of Disgorgement, Prejudgment Interest and Civil Penalties Against Defendants Jerome Coppage and Bill Wilson ("Damages Brief"), p. 3. Wilson was "the president of Gateway and signed investment agreements on behalf of Gateway," Complaint, ¶11; the SEC alleges that, like Coppage, Wilson "attended investor meetings with other Gateway promoters making numerous material misrepresentations and omitting to state material facts to investors in Gateway." Damages Brief, p. 3.

The SEC's complaint alleged that Coppage and Wilson, through their participation in the Gateway scheme, violated section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §78j(b), Rule 10b-5, 17 C.F.R. §240.10b-5, and sections 5(a), 5(c) and 17(a) of the Securities Act of 1933, 15 U.S.C. §§77e(a), 77e(c) and 77q(a). The complaint sought permanent injunctions prohibiting Wilson and Coppage from directly or indirectly "offer[ing] and sell[ing] securities when no registration statement is filed or is in effect as to such securities and when no exemption from registration is available." Complaint, Relief Requested Section, ¶IV. It also sought orders directing Wilson and Coppage to "disgorge all illegal gains, together with prejudgment interest" and to "pay civil money penalties, pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)] and 21 (d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]." *Id.*, ¶¶V-VI.

On November 6, 2001 Coppage signed a Consent and Stipulation, agreeing to the entry of

an order permanently enjoining him from violating Section 10(b) of the Exchange Act, Rule 10b-5 and Sections 5 and 17(a) of the Securities Act and granting the SEC other equitable relief, including disgorgement and civil penalties. *See* Consent & Stipulation of Jerome Coppage (attached as Exhibit F to the SEC's Damages Brief). Wilson signed a similar document on December 12, 2002. *See* Consent and Stipulation of Bill Wilson (attached as Exhibits H to the SEC's Damages Brief). In signing these documents, Coppage and Wilson admitted only the jurisdictional allegations of the complaint; they neither admitted nor denied the substantive allegations concerning their roles in the Gateway scheme, and in fact the Consents are completely silent as to what role either defendant played in the scheme. *See* Coppage Consent & Stipulation, ¶2; Wilson Consent & Stipulation, ¶2.

On November 17, 2001 and December 19, 2002, the Court entered "Orders of Permanent Injunction and Other Equitable Relief" against Coppage and Wilson respectively. Like the Consents, the Orders do not spell out what role, if any, the defendants played in the Gateway scheme; nor do they specify how the defendants violated the securities laws; the Orders simply describe the various types of relief awarded to the SEC against each defendant. In addition to permanently enjoining Coppage and Wilson from violating Section 10(b) of the Exchange Act, Rule 10b-5 and Sections 5 and 17(a) of the Securities Act, the Orders require Coppage and Wilson to "disgorge all ill-gotten gains received as a result of the conduct alleged in the Commission's Complaint, plus prejudgment interest on that amount." Order of Permanent Injunction and Other Equitable Relief Against Jerome Coppage, ¶IV; Order of Permanent Injunction and Other Equitable Relief Against Bill Wilson, ¶IV. They also provide that "the imposition of a civil penalty against Coppage [and Wilson] may be appropriate." Coppage

Injunction Order, ¶V; Wilson Injunction Order, ¶V. The orders did not set the amounts to be disgorged or the amount of any interest or penalties; rather, the Orders provide that the Court would set those amounts "in a separate hearing upon due notice and motion by the Commission." Coppage Injunction Order, ¶¶IV-V; Wilson Injunction Order, ¶¶IV-V.

To facilitate resolution of the damages issues, on January 17, 2003, the SEC filed its Damages Brief, asking the Court to order Coppage "to pay disgorgement of $2,469,403.83, prejudgment interest of $1,323,589.44 through January 31, 2003, and a civil money penalty of $2,469,403.83" and asking the Court to order Wilson "to pay disgorgement of $146,649.23, prejudgment interest of $55,111.03 through January 31, 2003, and a civil money penalty of $146,649.23." Damages Brief, p. 11. To support these figures, the SEC submitted an affidavit from Norman H. Jones, an accountant in the SEC's enforcement division who reviewed the bank records and other documents obtained in the case. Jones stated that Coppage was the signatory on two Gateway accounts, that $4,278,304.34 in funds directly traceable to deposits from Gateway investors were deposited into these two accounts, that $772,569.57 was transferred from these two accounts to other defendants, that $1,036,330.94 was disbursed by order of the Court to the Court's registry, and that the remaining $2,469,403.80 represents ill-gotten gains received by Coppage, though Jones could not say who ultimately obtained possession of this money. Affidavit of Norman H. Jones in Support of Plaintiff's Brief in Support of Damages Against Defendants Jerome Coppage and Bill Wilson, ¶¶4-8 (attached as Exhibit B to the SEC's Damages Brief). With regard to Wilson, Jones stated that $146,649.23 in funds directly traceable to Gateway investors were deposited into three different Gateway accounts and then transferred to an account Wilson held jointly with his wife, and that this amount represents ill-gotten gains

4

received by Wilson. *Id.*, ¶¶9-14.

Coppage filed a brief in response to the SEC's Damages Brief, arguing that any money he received from Collins or from the Gateway accounts represented repayments of loans he previously made to Collins. Coppage provided no documentary evidence to support this claim, though the transcript of his testimony before the SEC is generally consistent with his explanation. *See* SEC's Damages Brief, Exhibit C. Wilson also filed a brief in response to the SEC's Damages Brief, arguing that any money he received from Gateway accounts represented salary and reimbursements for business-related expenses. He submitted an affidavit swearing under oath that this was true, and he provided copies of Visa and American Express statements and phone bills that purportedly reflected outlays he made on behalf of Gateway and its principals.

On February 13, 2003, the Court held a hearing to address the issues raised in the parties' damages briefs. The Court expressed some concern that the parties had failed to provide any analysis of the legal standards to be applied in assessing the equitable remedies requested and also that it was being asked to make findings concerning matters about which it had heard no evidence. At the hearing, the Court directed the parties to submit supplemental briefs on damages, specifically addressing key legal points, including the question of what constitutes "ill-gotten gains" within the meaning of the securities laws. The Court also directed the parties to address its evidentiary concerns and to advise the Court as to whether they thought the Court was required to hear evidence before fixing the damages amounts to be paid by the defendants.

Consistent with the Court's directives, the parties all filed supplemental briefs. In its supplemental brief, the SEC came down quite a bit off its disgorgement number for Coppage, seeking $183,914.31 – the amount the SEC contends "that it can prove with certainty were

received by Defendant Coppage in connection with his involvement with Gateway." SEC's Supplement Brief in Support of Disgorgement, Prejudgment Interest and Civil Penalties Against Defendants Jerome Coppage and Bill Wilson ("Supplemental Damages Brief"), p. 3. The SEC supported its new disgorgement figure with a summary chart and with bank records showing the transfers made from Gateway accounts to accounts held by Coppage or by Sextant Administrative Medical Management, of which Coppage was the President and Secretary. Along with the disgorgement, the SEC asked the Court to order Coppage to pay prejudgment interest through February 28, 2003 in the amount of $81,632.88 and a third tier civil penalty in an amount equal to the disgorgement amount ($183,914.31). The SEC stood firm with respect to Wilson, repeating its request for a disgorgement order and a civil penalty in the amount of $146,649.23, plus prejudgment interest through February 28, 2003 in the amount of $55,111.03. Notably absent from the SEC's supplemental brief is any analysis of why these sums constitute "ill-gotten gains" or "unjust enrichment" subject to disgorgement. The second brief, like the initial Damages Brief, assumes without discussion or analysis that this is so.

Coppage's supplemental submission reiterates his claim that the money he received from Collins or Gateway represented repayments of loans and not ill-gotten gains. This time, Coppage submitted a declaration and copies of checks he had written to Collins between 1994 and September 1997, all before the Gateway scheme is alleged to have begun. *See* Second Declaration of Jerome Coppage and Exhibit 1 attached thereto (attached as Exhibit B to Supplemental Brief of Defendant Jerome Coppage in Opposition to the SEC's Request for Disgorgement, Prejudgment Interest and Civil Penalties). According to Coppage, the checks evidence that he lent Collins approximately $144,762.00, which means that the repayment of

those loans cannot constitute ill-gotten gains. Coppage makes no argument concerning the remaining $39,152.31 the SEC says he received.

In his supplemental brief, Wilson concedes that he received $146,649.23, and he again claims that Gateway paid him the money as salary and to reimburse him for business-related expenses he had charged or incurred on behalf of Gateway principals. Wilson submitted a second affidavit, which says pretty much what the first affidavit said, along with some additional credit card itemizations and a partially hand-written summary document listing the salary payments and the expense reimbursements; he claims that $40,140.00 of the $146,649.23 was salary and the remaining $106,509.23 was reimbursements.

On March 11, 2003, the parties filed a second round of supplemental submissions. Coppage and the SEC submitted a joint filing stating that, because of some accidental double counting, the aggregate amount of the checks submitted in support of Coppage's position that he loaned Collins money is $103,966.00, not $144,762.00. *See* Joint Submission of Coppage and the SEC, p. 2. The SEC continues to take the position that none of the $183,914.31 paid to Coppage were loan repayments. With respect to Wilson, the March 11 submissions really do not change anything: Wilson and the SEC agree that Wilson received $146,649.23; Wilson argues that $40,140.00 of that was for salary and $106,509.23 was reimbursements for Gateway-related expenses; the SEC argues that Wilson should be required to disgorge the entire amount and that he should not receive credit for any of the charges reflected on credit card statements he submitted because those statements raise more questions than they answer. *See* Joint Submission of Wilson and the SEC, pp. 2-3.

Finally, in the March 11 submissions, the parties stated that no evidentiary hearing was

7

necessary on the damages issues, and each waived any right they may have had to present further evidence on the nature and amount of damages to be ordered by the Court. *See* Joint Submission of Coppage and the SEC, p. 3; Joint Submission of Wilson and the SEC, p. 3. Thus, the parties all agree that the Court now has everything it needs to decide the damages questions; the purpose of this Memorandum Opinion and Order is to do just that.

We turn first to the SEC's request for orders of disgorgement. "Disgorgement is an equitable remedy designed to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws." *SEC v. First City Financial Corp., Ltd.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989) (citations omitted). The district court has broad discretion in deciding whether to award disgorgement at all and, if awarded, in fixing the amount to be disgorged. *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996); *SEC v. Loren*, 76 F.3d 458, 462 (2d Cir. 1996). If ordered, the disgorgement amount must be "a reasonable approximation of profits causally connection to the violation." *SEC v. Patel*, 61 F.3d 137, 139 (2d Cir. 1995) (citing *First City Financial*, 890 F.2d at 1231). The SEC bears the burden of proving that its disgorgement figure reasonably approximates the amount of unjust enrichment; if it satisfies its burden, the defendant must come forward to demonstrate that the SEC's disgorgement figure is *not* a reasonable approximation. *First City Financial*, 890 F.2d at 1232.

The SEC asks the Court to order Coppage to disgorge $183,914.31; it argues that this sum represents the amount of Gateway-related funds that went directly to Coppage. With respect to Wilson, the SEC asks the Court to order disgorgement in the amount of $146,649.23, which represents the total amount Wilson received from Gateway accounts. As explained above, the SEC has offered documentary evidence to substantiate its claims that Coppage and Wilson

received these sums from accounts held by or associated with the Gateway Association. And, in fact, Coppage and Wilson concede that they received these sums from Gateway-associated accounts. The relevant question for our purposes is whether money obtained from investors is necessarily subject to disgorgement, something the SEC seems to have assumed. On the record that has been submitted to the Court, the answer is no.

Implicit in the disgorgement analysis is the notion that the person ordered to cough up the money actually received the money unjustly, i.e., that he received the money by means of a violation of the securities laws or through fraud or some other wrongdoing. The cases make clear that the remedy is designed to strip a wrongdoer of his unjust enrichment or illegal profits; the remedy is not designed to punish. *See, e.g., First City Financial*, 890 F.2d at 1230-31 ("[d]isgorgement is . . . designed to deprive a wrongdoer of his unjust enrichment"; "disgorgement may not be used punitively"); *First Jersey Securities*, 101 F.3d at 1474 ("The primary purpose of disgorgement . . . is to deprive violators of their ill-gotten gains . . . ."). The very language used in the cases – e.g., "*unjust* enrichment," "*ill-gotten* gains," "*wrong*doer" – emphasizes that the remedy is imposed against the people who violate the securities laws, not simply the people who possess money obtained through violations committed by others. The SEC essentially concedes in its damages brief that disgorgement is appropriate only as against "wrongdoers," those who violated the law. *See* Damages Brief, pp. 7-8. Thus, before we can order disgorgement, we need some evidence that these particular defendants violated the securities laws, participated in the fraud or otherwise engaged in some wrongdoing. The SEC has offered no such evidence.

To support its damages claim, the SEC has established that Coppage and Wilson attended

9

Gateway promotional meetings and that Wilson sent out letters promoting the Gateway Association. *See* Transcript of Testimony Given By Jerome Coppage on February 24, 2000, pp. 73-76 (attached as Exhibit C to the SEC's Damages Brief); Letter from Bill Wilson (attached as Exhibit D to the SEC's Damages Brief). These facts, without more, do not show that Coppage and Wilson violated any securities laws or committed any wrongdoing; among other things, they do not reveal the requisite intent. In its first brief on damages, the SEC argued that Coppage and Wilson both attended Gateway promotional meetings and that, at those meetings, they made numerous material misrepresentations and omitted to state material facts to investors in Gateway. *See* Damages Brief, p. 3. These allegations are closer to the mark. But the evidence cited by the SEC to support those statements shows only that Coppage and Wilson attended the meetings. *See* Transcript of Coppage Testimony, pp. 25-29, 73-76 (attached as Exhibit C to the SEC's Damages Brief). The SEC offered no evidence that Coppage and Wilson ever made any misrepresentations – at the meetings or anywhere else – let alone that they did so knowingly. Similarly, although the SEC submitted a letter written by Bill Wilson on behalf of the Gateway Association, *see* Letter from Bill Wilson (attached as Exhibit D to the SEC's Damages Brief), it offered no evidence giving context to the letter. Thus we have no basis to conclude that the letter contained any misrepresentations or that it omitted to state material facts, and in any event the SEC has offered no evidence of Wilson's intent.

It is true that the SEC's complaint alleges that Coppage and Wilson violated the securities laws. But the allegations have not been supported in the materials provided to us, and given the

language of the consents each signed, we cannot rely on those allegations to prove the point.[1] Specifically, the SEC has offered no evidence that Coppage and Wilson knowingly participated in the alleged fraud or that they even knew that Gateway's investment program was a complete scam – indeed, the evidence submitted by the SEC does not even permit the Court to make a finding with regard to Coppage and Wilson that Gateway's investment program *was* a complete scam.[2] Through Norman Jones, the SEC's accountant, the SEC has established that Coppage and Wilson received money that could be traced directly back to people who invested in the Gateway Association. But even if we accept that the Gateway Association was a complete scam and that Collins and others obtained money from investors through fraud, the SEC has cited no case holding – or even hinting – that receipt of money obtained through someone else's securities laws violations is a sufficient basis to order disgorgement, especially where there is no evidence showing that the recipient even knew about those violations. Ordering disgorgement in a situation such as this would seem to be entirely at odds with the established purposes of disgorgement. Absent some evidence that Coppage and Wilson either knew about the fraud or participated in the fraud, disgorgement would be punitive based on the record submitted to the Court.

---

[1] Jones' conclusory statements in his affidavit regarding "ill-gotten" gains are unsupported, and in any case he lacks the requisite personal knowledge to opine on whether the gains were actually ill-gotten.

[2] The Court is aware that Richard Collins pled guilty to criminal charges arising out of his conduct in the Gateway scheme, and that the plea agreement reached in Collins' criminal case states that Gateway's investment program never existed. *See* Plea Agreement filed April 29, 2003 in *United States v. Collins*, No. 02 CR 831 (N.D. Ill.). But the statements in that agreement are hearsay as to these defendants, and, in any event, the SEC has not attempted to prove its case here with any evidence obtained through the criminal matter; as explained, it hasn't offered any evidence at all.

11

In sum, the SEC's arguments concerning disgorgement simply assume that money obtained from Gateway-related accounts is all ill-gotten gains. While the Court can easily envision a scenario in which this would be the case, on the record presented we have no basis to conclude that this holds true for Coppage and Wilson, whose role in the scheme has never been explained or substantiated. Based on the evidence submitted, the Court finds that the SEC has failed to meet its burden of showing that the money Coppage and Wilson received was causally related to any wrongdoing and therefore declines to order disgorgement against these defendants. *See First City Financial*, 890 F.2d at 1231 ("the court may exercise its equitable power only over property causally related to the wrongdoing."). Our decision not to order disgorgement also resolves the SEC's request for prejudgment interest on the disgorgement amounts.

It may very well be that Coppage and Wilson *did* violate the securities laws and that our ruling today allows them to keep money that was fleeced from innocent investors. But if this is so, the result obtained because the SEC failed to present the evidence necessary to make out a case against these two defendants. The SEC may have believed that if it threw out enough general allegations about the Gateway Association, the Court would find the whole mess sufficiently foul smelling to order anyone even remotely associated with the scheme to pay up. That is not the way things work. To win a judgment, a party must present evidence to support its contentions, and the SEC failed to do so. The fact that the Court had already entered injunction orders does not relieve the SEC of that responsibility.

In addition to disgorgement, the SEC seeks civil penalties from Coppage in the amount of $183,914.31 and from Wilson in the amount of $146,649.23. The Securities Act provides that "[w]henever it shall appear to the Commission that any person has violated any provision of this

subchapter [or] the rules or regulations thereunder, . . . the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation." 15 U.S.C. §77t(d)(1). Three "tiers" of penalties may be imposed: a "first tier" penalty may be imposed in an amount "determined by the court in light of the facts and circumstances," *id.* §77t(d)(2)(A); a "second tier" penalty is appropriate "if the [defendant's] violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement," *id.* §77t(d)(2)(B); and a "third tier" penalty is appropriate if "the [defendant's] violation . . . involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and [the defendant's] violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," *id.* §77t(d)(2)(C).

As an initial matter, despite the lack of evidence establishing the commission of securities violations Coppage and Wilson, the Court finds that a civil penalty is appropriate because each of them consented that one should be imposed. With respect to civil penalties, the Order entered against Coppage provided:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the imposition of a civil penalty against Coppage may be appropriate. This Court will set the specific amount of the penalty in a separate hearing upon due notice and motion by the Commission. At that hearing, the issue will be limited to determining the amount of the civil penalty to be ordered and Coppage will be precluded from denying that he violated the federal securities laws.

Coppage Injunction Order, p. 5. The Order entered against Wilson contained the same language. *See* Wilson Injunction Order, p. 6. Additionally, the Consent and Stipulation signed by Wilson provided that Wilson consented to the entry of a final judgment that, among other things, "orders

13

Defendant to pay a civil penalty in an amount to be set by the Court upon motion by the Commission . . . ." Wilson Consent & Stipulation, ¶2(c). The document Coppage signed was not quite as explicit; it provided simply that Coppage consented to the entry of the Order quoted above, without describing the specific forms of equitable relief to be ordered. *See* Coppage Consent & Stipulation, ¶2. But in both cases, the Court finds that the defendant agreed to pay a civil penalty.[3]

The lack of evidence concerning the nature of the alleged violations does, however, impact which "tier" is implicated. To impose a third tier penalty, which is what the SEC seeks, or to impose a second tier penalty, the Court must find that Coppage and Wilson violated the securities laws in a manner that involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. §77t(d)(2)(B), (C). As explained above, the SEC has presented no evidence to support such a finding. The SEC argued that Coppage and Wilson made fraudulent misrepresentations to investors, but it provided no evidence to back that up. Thus, any penalty must be imposed under the first tier.

The amount of a penalty imposed under the first tier "shall not exceed the greater of (i) $5,000 for a natural person . . . or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation." 15 U.S.C. §77t(d)(2)(A). Notably, here we are concerned with "pecuniary gain," which, as contrasted with "ill-gotten gains," need not involve any wrongdoing

---

[3] The Orders also required Coppage and Wilson to pay disgorgement, which at first blush suggests that the Court is being inconsistent in addressing the various forms of equitable relief. Not so. The Orders required Coppage and Wilson to disgorge *all ill-gotten gains received* as a result of the conduct alleged in the Commission's Complaint . . . ." Coppage Injunction Order, p. 4; Wilson Injunction Order, p. 4 (emphasis added). As explained above, the SEC failed to show that Coppage or Wilson received any "ill-gotten" gains, leading to the inescapable conclusion that the amount to be disgorged was exactly zero.

14

on the part of the recipient. *See* Black's Law Dictionary, p. 686 (7th ed. 1999) (defining "pecuniary gain" to mean "[a] gain of money or of something having monetary value"). Although the SEC has offered no evidence from which the Court could conclude that Coppage and Wilson obtained "ill-gotten gains," it has offered evidence showing that they each received some measure of pecuniary gain through their involvement with the Gateway Association.

The evidence shows that Coppage received $183,914.31 from Gateway-related accounts. Coppage argues, however, that $103,966.00 of that constituted repayments of loans he had previously made to Collins. If this were true, these amounts would simply return Coppage to the financial position he enjoyed before loaning money to Collins; they would not represent pecuniary gain to Coppage. And Coppage has supported his claim with copies of checks he wrote to Collins before the Gateway scheme is alleged to have begun and with a sworn declaration stating that the checks reflect loans he made to Collins. The SEC "strongly contests" that Coppage made any loans to Collins and "strongly contests" that the money Coppage received from Gateway had anything to do with any loans. *See* Submission of the SEC is Support of its Request for Disgorgement, Prejudgment Interest and Civil Penalties Against Defendant Jerome Coppage, ¶3. Yet it offers no evidence to rebut Coppage's declaration or to undermine the evidence he submitted. Accordingly, the Court finds that the amount of Coppage's pecuniary gain is $79,948.31 – the amount Coppage received less the amounts that the evidence reflects constituted repayment of loans.

With respect to Wilson, the evidence shows that he received $146,649.23 from Gateway-related accounts. Wilson argues, however, that $40,140.00 of this was salary and that the remaining $106,509.23 was reimbursement for business-related expenses. As to the former, even

15

if this is true, it would still be a "gain" in the sense that his financial pool actually grew as a result of receiving it. As to the latter, however, if Wilson is right, that $106,509.23 would not represent any gain; getting the money would simply bring him back to zero, because he had already spent the money from his own financial resources. To support his claim on this issue, Wilson submitted a sworn affidavit stating that "the office charged a total of $104,589.98 to my cards, and $1919.25 came out of my pocket for" "expenses for the office, employees, and the principals of Gateway." Wilson Affidavit, ¶¶4-5 (attached as Exhibit B to Wilson's Supplemental Brief In Opposition to Disgorgement). Wilson provided credit card statements purportedly reflected the various expenses he charged, but the statements do not establish that the charges were incurred for Gateway-related items or trips. Some of the air travel expenses include the passenger's name, and the Court is at least able to discern that the person for whom Wilson bought the ticket was associated with Gateway. This, especially in the absence of any conflicting evidence from the SEC, is enough to show that some of these expenses were incurred for Gateway-related business. But most of the statement entries are less clear; the Court is unable to tell what exactly the expenditure covers or whether it was made in connection with Gateway. The SEC provided the Court with no evidence to rebut Wilson's affidavit or documentary evidence, however; it simply states that it believes the statements raise more questions than they answer. Based on its review of the credit card statements and Wilson's affidavit, together with the other record evidence and the arguments made by the parties, the Court finds that the amount of Wilson's pecuniary gain is $92,609.99 ($40,140.00 + $106,509.23 - $54,039.24), the amount he received from investor funds, less the amounts the Court finds represented reimbursements of Gateway expenses (in other words, the amounts Wilson has shown were charges indisputably

16

incurred in the names of Gateway-related individuals).

Finally, the Court must consider the defendants' arguments concerning financial hardship. Both Coppage and Wilson have argued that the Court should waive the civil penalty because neither has the financial resources to pay it. A defendant's finances may be relevant, to some extent, in determining the size of the civil penalty. *See SEC v. Parks*, 222 F. Supp. 2d 1124, 1134 (C.D. Ill. 2002); *SEC v. Robinson*, No. 00 Civ 7452 RMB AJP, 2002 WL 1552049, at *12 (S.D.N.Y. July 16, 2002); *SEC v. McCaskey*, No. 98CIV6153SWKAJP, 2002 WL 850001, at *15 (S.D.N.Y. March 26, 2002). The financial information provided by Coppage and Wilson shows that neither has substantial assets and both have modest incomes. But they are not destitute, and they both received a lot of money from defrauded investors, even if they now have little or nothing to show for it. Based on the facts and circumstances as presented, the Court finds that a significant first tier penalty is appropriate. According, the Court will impose a first tier penalty on each defendant in the amount of approximately one-half his pecuniary gain: $40,000 as to Coppage and $46,000 as to Wilson.

## Conclusion

For the reasons set forth in this Opinion, the Court orders Jerome Coppage to pay a first tier civil penalty in the amount of $40,000.00 and orders Bill Wilson to pay a first tier civil penalty in the amount of $46,000. The Clerk is directed to enter a separate judgment as to each defendant. The SEC's request for relief is otherwise denied.

Dated: May 21, 2003

MATTHEW F. KENNELLY
United States District Judge

17